STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

08-1198


ADELE GRADNIGO, ET UX.

VERSUS

LOUISIANA FARM BUREAU CASUALTY INS. CO., ET AL.


**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-20050340
HONORABLE J. BYRON HEBERT, DISTRICT JUDGE

**********

ULYSSES GENE THIBODEAUX
CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Jimmie C. Peters, and Michael G. Sullivan, Judges.


AFFIRMED AS AMENDED.


Edward O. Taulbee, IV
Taulbee & Associates, L.L.C.
P. O. Box 2038
Lafayette, LA 70502-2038
Telephone: (337) 269-5005
COUNSEL FOR:
    Defendants/Appellees - Louisiana Farm Bureau Casualty Ins. Co.
    and Hannah Venable

Archie P. Joseph
P. O. Box 1283
Breaux Bridge, LA 70517
Telephone: (337) 332-5287
COUNSEL FOR:
    Plaintiffs/Appellants - Adele Gradnigo and Gerald Gradnigo

**Christ Beaner**
**P. O. Box 93814**
**Lafayette, LA 70509**
**Telephone:  (337) 303-4333**
**COUNSEL FOR:**
**Plaintiffs/Appellants - Adele Gradnigo and Gerald Gradnigo**

**THIBODEAUX, Chief Judge.**

Plaintiffs-appellants, Adele Gradnigo (Gradnigo) and her spouse, Gerald Gradnigo (Gerald), appeal the quantum of the damage awards rendered by a jury after the trial of her personal injury action for damages sustained in a motor vehicle accident. Defendants, Hannah Venable (Venable), and her automobile insurer, Louisiana Farm Bureau Insurance Company (Louisiana Farm Bureau), have answered the appeal, asserting the trial court abused its discretion by taxing them with the payment of Gradnigo's expert witness costs, when Gradnigo was unsuccessful on the particular claims related to the testimony offered by those witnesses.

We find the jury abused its discretion in quantifying damages for past medical expenses and past and future loss of enjoyment of life. Therefore, the jury's award of $10,000.00 in past medical expenses is reversed, and an award of $14,526.55 for past medical expenses incurred is rendered in accordance with the evidence established at trial. The plaintiff is awarded $10,000.00 for past and future loss of enjoyment of life. All other aspects of the jury's damage awards are affirmed.

Further, we affirm the trial court's assessment to the defendants of the expert witness costs for orthopedic surgeon, Dr. John Cobb, vocational rehabilitation counselor, Scott Smith, and economist, Dr. Douglas Womack.

I.

**ISSUES**

1. Did the jury abuse its discretion by awarding Gradnigo $30,000.00 in general damages for past and future pain and suffering for the injuries she alleged were caused by the motor vehicle accident: headaches, right shoulder and neck strain, three herniated thoracic spine discs, and one bulging lumbar spine disc?

2. Did Gradnigo establish that she incurred compensable past medical expenses in the amount of

$14,526.55, thus requiring the reversal of the jury's award of $10,000.00 for past medical expenses?

3. Did the jury err in awarding only $15,000.00 for future medical expenses when evidence was presented by Gradnigo's treating orthopedist of his recommendation for spinal surgery and future medical treatment at an estimated cost of $107,000.00?

4. Did the evidence establish that Gradnigo's injuries from the accident caused her to incur past lost wages in the amount of $23,823.16, as calculated by her expert economist, rather than the $1,200.00 awarded to her by the jury?

5. Did Gradnigo establish at trial that the accident caused her a loss of future earning capacity ranging between $560,828.00 and $781,075.00, requiring a reversal of the jury's award of $0 in damages for this category of loss?

6. Did the jury abuse its discretion by awarding $0 in damages to Gradnigo for her past and future loss of enjoyment of life?

7. Did the jury abuse its discretion in awarding $0 in damages to Gradnigo's husband, Gerald Gradnigo, for the loss of consortium he allegedly experienced as a consequence of his wife's accident-related injuries?

8. Did the trial court abuse its discretion by assessing Venable and Farm Bureau with the payment of the plaintiff's expert witness fees for orthopedic surgeon, Dr. John Cobb, vocational rehabilitation counselor, Scott Smith, and economist, Dr. Douglas Womack, when the jury rejected the plaintiffs' claims for future medical expenses and certain past and future lost wages?

II.

## FACTUAL BACKGROUND

On January 21, 2004, Gradnigo was driving to work when her vehicle was struck on the right rear passenger side as she drove through an intersection in

Lafayette, Louisiana. Venable had been traveling on a road perpendicular to the one being traveled by Gradnigo. Upon approaching the intersection of those roads, Venable failed to yield to a red traffic light and struck Gradnigo's vehicle.

Gradnigo's vehicle was spun around approximately 180 degrees as a result of the impact. Both vehicles were able to be driven away from the scene, and the damage to Gradnigo's vehicle was minor to moderate. Gradnigo's air bags did not deploy during the accident, and she declined medical assistance at the scene. Gradnigo left the accident scene and drove herself to work at Lafayette General Medical Center (LGMC), where she was employed as a licensed practical nurse (LPN).

Gradnigo alleges she left work early that day and did not report to work the following day, due to a headache that began shortly after the accident occurred. Gradnigo began medical treatment with internal medicine physician, Dr. Bryan LeBean, about two weeks after the accident occurred. She sought relief from pain which Dr. LeBean diagnosed initially as cervical strain, thoracic strain, right shoulder strain, and tension headaches. Ultimately, it was determined that Gradnigo suffered from three bulging thoracic spine discs and one bulging lumbar disc.

She endured a course of conservative medical treatment under the supervision of Dr. LeBean and orthopedic surgeon, Dr. John Cobb, which included months of physical therapy, and, ultimately, treatment by pain management specialist, Dr. Stephen Staires. Reporting that she was able to manage her pain and that her symptoms of neck and shoulder pain had essentially abated, she ended her treatment with these doctors in February 2006, approximately two years after the date of the accident. While she was being treated by her doctors, she continued to work as a

3

float nurse at LGMC and only missed seven days of work there. Her employment records indicated exemplary performance of her job during this time period.

Gradnigo went unobserved by doctors until approximately eighteen months later in June 2007, at which time she resumed treatment with Dr. Cobb, complaining of an increase in mid-back and low-back pain. He reinstituted some of his prior methods of treatment—physical therapy, pain medication, and muscle relaxants—and he began having Gradnigo use a TENS unit (a device that is worn to help stimulate pain relief). Dr. Cobb reiterated to Gradnigo that ultimately a laminectomy, discectomy, and fusion may be required if conservative treatment failed to fully resolve her symptoms. He had provided this advice to her in 2005, in response to Gradnigo's complaints that the conservative treatments were only temporarily alleviating her symptoms.

During the trial, Gradnigo's Motion for a Directed Verdict on liability was granted after evidence was produced that Venable caused the accident. The jury's findings and awards as to damages, which were subsequently rendered by the trial court in its Judgment, were as follows:

1.  Did ADELE GRADNIGO suffer any damages as a result of the accident on January 21, 2004?

    ___x___ Yes          _____ No

    (If YES, proceed to Question 2. If NO, please sign the bottom of the form and return it to the bailiff.)

2.  What amount, in dollars and cents, if any, will fairly compensate ADELE GRADNIGO for the following:

    Pain and Suffering (past and future)     $ 30,000

    Loss of enjoyment of life (past and future)  $   0.00

    Past medical expenses                    $ 10,000

    Future medical expenses                  $ 15,000

4

| | | |
|---|---|---|
| Los[t] Wages | $ | 1,200 |
| Loss of future earning capacity | $ | 0.00 |

3. Did Gerald Gradnigo suffer any damages as a result of the accident?

_____Yes          ___x___ No

Gradnigo's appeal asserts that the jury abused its discretion in quantifying the amount of many of the awards rendered. Regarding general damages, she seeks an increase in the $30,000.00 awarded to her for past and future pain and suffering to an amount of $175,000.00 or greater. She contends that the jury abused its discretion as well by failing to award any damages for her loss of enjoyment of life, as well as for her husband's loss of consortium. The appeal seeks $40,000.00 for past and future loss of enjoyment of life and $20,000.00 to Gradnigo's spouse for his alleged loss of her services, sex, society, and support following the accident.

Gradnigo contends that the jury erred in awarding only $10,000.00 in past medical expenses because the medical records introduced into evidence, without objection, revealed that she incurred medical expenses in the amount of $14,526.55. Moreover, she contends that the jury's award of only $15,000.00 for future medical expenses is abusively low, when she presented evidence substantiating a minimum award of $165,000.00, due to the recommendation that she undergo spinal surgery and the estimates of post-operative care and treatment that will be needed. Gradnigo claims an increase in the damage award for past lost wages from the $1,200.00 awarded by the jury to $23,823.16 is due, based on the calculations presented by economist, Dr. Douglas Womack. Finally, she seeks a reversal of the jury's award of $0 to her for loss of future income. Gradnigo claims she is entitled to between $560,828.00 and $781,075.00 because the accident extinguished her ability to return to work as an LPN or to become trained and subsequently seek employment as an RN

5

and has forced her to obtain a lower-paying job that requires a lower level of physical mobility than that required of an RN or LPN in the performance of their duties.

The defendants allege that the jury made reasonable factual findings based on the evidence presented at trial and did not abuse its discretion in determining the awards that were rendered. They argue that Gradnigo's credibility was damaged throughout the trial by the presentation of evidence that showed she was inconsistent, and less than truthful in accurately reporting her physical limitations and levels of pain relief to her healthcare providers while under their care. Moreover, they contend that the jury's awards also reflect reasonable conclusions about the following: Gradnigo was fully recovered from any accident-related injuries as of February 2006, and she was not severely injured by the accident, as evidenced by her ability to continue to excel at the performance of her duties as an LPN for two years after the accident, without any accommodations.

Because of these possible reasonable findings, the defendants argue that the jury's awards reflect a rejection of any sought-after damages for medical expenses incurred after the initial two-year period of treatment and for those sought for future treatments. Additionally, they argue the jury was reasonably justified in rejecting in entirety the claims for loss of earning capacity, loss of enjoyment of life, and loss of consortium.

III.

## LAW AND ANALYSIS

### *General Damages*

*Standard of Review*

General damages are "inherently speculative" and unable to be fixed with mathematical certainty. *Wainwright v. Fontenot*, 00-492, p. 6 (La. 10/17/00),

774 So.2d 70, 74 (citation omitted). This, consequently, means that the assessment of the appropriate amount of such damages is a question of fact to be determined on a case-by-case basis, and because each case is different, the adequacy or inadequacy of the award should be determined by the facts or circumstances particular to the case under consideration. *Youn v. Maritime Oversees Corp.*, 623 So.2d 1257 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994). The fact finder's determination is given "great deference" on appeal; therefore, the appellate court's role is to review that exercise of discretion. *Id.* Moreover, "[t]he facts submitted as evidence must be reviewed by the appellate court in the light most favorable to the judgment rendered." *Venissat v. St. Paul Fire & Marine Ins. Co.*, 06-987, p. 17 (La.App. 3 Cir. 8/15/07), 968 So.2d 1063, 1074 (citing *Theriot v. Allstate Ins. Co.*, 625 So.2d 1337 (La.1993)).

The application of this standard has been explained by the supreme court as follows:

> In *Reck [v. Stevens,* 373 So.2d 498 (La.1979)], this court disapproved the appellate court's simply reviewing the medical evidence and then concluding that the award for those injuries was excessive, without taking into consideration the particular effect of the particular injuries on the particular plaintiff. This court further disapproved of the use of a scale of prior awards in cases with generically similar medical injuries to determine whether the particular trier of fact abused its discretion in the awards to the particular plaintiff under the facts and circumstances peculiar to the particular case. The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. *Gaspard v. LeMaire*, 245 La. 239, 158 So.2d 149 (1963); *Ballard v. National Indem. Co. of Omaha, Neb.*, 246 La. 963, 169 So.2d 64 (1964); *Lomenick v. Schoeffler*, 250 La. 959, 200 So.2d 127 (1967). Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion. *Coco v. Winston Industries, Inc.*, 341 So.2d 332 (La.1976); *Bitoun*

7

*v. Landry*, 302 So.2d 278 (La.1974); *Spillers v. Montgomery Ward & Co.*, 294 So.2d 803 (La.1974).

> The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from *Gaspard v. LeMaire*, 245 La. 239, 158 So.2d 149 (1963) through *Coco v. Winston Industries, Inc.*, 341 So.2d 332 (La.1976), and through *Reck* to the present case is that the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.

*Youn*, 623 So.2d at 1260-61.

*Past and Future Pain and Suffering*

Gradnigo asserts that the amount awarded for past and future pain and suffering is abusively low and should be raised to $175,000.00. She states that the amount is justified due to her suffering over the past four years with, initially, the tension headaches, right shoulder strain, and neck strain, and later with the ongoing pain caused by three herniated thoracic discs and one annular bulging lumbar disc. Gradnigo relies almost exclusively on her history of medical treatment post-accident and Dr. Cobb's recommendation for surgery as a measure of proof of her pain and suffering.

A review of her medical history reveals that on February 9, 2004, approximately two weeks after the accident occurred, Gradnigo first sought medical treatment for symptoms she believed were the result of injuries suffered in the accident. She saw Dr. LeBean, an internal medicine physician. Her chief complaints

to him were of right shoulder pain, headaches, and mid-back pain. She reported a history of no prior major illnesses or injuries. Dr. LeBean performed a physical examination of Gradnigo and found "positive, severe tenderness to palpation on the right side [of the neck] with decreased range of motion." Her back examination revealed "positive severe tenderness to palpation in the thoracic area." The right shoulder examination revealed "positive severe tenderness to palpation with a decreased range of motion." Dr. LeBean consequently diagnosed a cervical strain, thoracic strain, right shoulder strain, and tension headaches. He prescribed pain medication, muscle relaxants, and a physical therapy protocol to be conducted at his office. Dr. LeBean advised Gradnigo that she could return to work with "moderate limitations," which he defined at trial as "[u]sually lifting no greater than fifteen pounds [and] no standing or walking in excess of thirty minutes or so." Consequently, Gradnigo continued to work with no limitations as a float nurse at LGMC. Lifting and turning of patients was not an issue, as testimony was offered by Gradnigo and several of her nursing co-workers that they worked as a team on such matters.

Over the next several months, through Dr. LeBean's office, Gradnigo participated in the physical therapy sessions, which consisted of mostly hydrotherapy. She continued her medications as well (pain medication and muscle relaxants) which ultimately resulted in the resolution of her shoulder pain and, temporarily, her neck pain. Her headaches resolved as well. However, in July 2004, because of her continuing complaints of mid-back pain, Dr. LeBean ordered the first MRI of Gradnigo's thoracic spine taken. That MRI revealed small or mild disc herniations at T5-T6, T6-T7, and T9-T10 and changes that were considered to be degenerative in nature—"mild exaggeration of the normal thoracic kyphosis [bending of the spine

9

forward]" and "multi-level osteophytes [bone spurs]," collectively referred to as spondylosis.

Dr. LeBean referred Gradnigo to an orthopedic surgeon, Dr. John Cobb, who evaluated her for the first time in August 2004. Dr. Cobb reviewed the MRI results and diagnosed herniated discs at T5-10 and a lumbosacral sprain; however, he found no evidence of nerves or nerve roots being pinched. He prescribed active physical therapy to address the continuing pain complaints and observed the results of that over the next few months. By November 2004, Gradnigo reported essentially no neck pain and that her lower back pain was "doing reasonably well." She also reported that her mid-back or thoracic area of pain had become "manageable." Physical therapy under Dr. Cobb's monthly observation continued.

In July 2005, because Gradnigo complained of a return of a "moderate" degree of pain in the thoracic and lumbar areas and a "moderate" degree of positional intolerance, requiring her to keep altering her positions, i.e., moving, standing, or sitting, in order to gain relief, Dr. Cobb referred her to Dr. Stephen Staires. Dr. Staires is an anesthesiologist who specializes in interventional pain management, particularly with the use of injections. As of September 2005, Gradnigo reported to Dr. Cobb that the few injections she had been given provided only limited, short-term relief. Nevertheless, Dr. Staires did not recommend additional injections to her. Rather, he recommended other conservative treatment such as massage therapy.

Dr. Cobb discussed re-instituting physical therapy as well around that time and advised Gradnigo that if her pain was unacceptable, a surgical approach—a laminectomy and disc excision and a fusion of the affected areas—would likely be necessary to alleviate her symptoms. Surgery was not scheduled, and Gradnigo continued treatment with Dr. Staires. By December 2005, Dr. Cobb's impression was

10

that the source of Gradnigo's pain was likely the thoracic disc herniations and axial instability caused by the degenerative changes in the lumbar disc, and he again discussed surgical options with Gradnigo. She opted to not undergo surgery. In January 2006, Gradnigo met with Dr. Cobb and reported that she was no longer under Dr. Staires' care, was taking a muscle relaxant, and had reached a position in which was capable of managing her pain. No follow-up visit with Dr. Cobb was scheduled at that time.

Dr. Cobb resumed care and observation of Gradnigo approximately one and one-half years later, on June 4, 2007. Gradnigo complained of worsening mid-back pain. Dr. Cobb discussed conservative and surgical options, and her care resumed with the use of prescribed muscle relaxants, pain medication, physical therapy, and home use of a neuromuscular stimulator, or TENS unit. Gradnigo remained under Dr. Cobb's care at trial time.

The defendants assert that although Gradnigo relies on her history of medical care and pain complaints as evidence of her level of pain and suffering post-accident, the jury's award was not an abuse of its discretion and was based on contrary facts presented at trial showing Gradnigo as less than credible. They assert that Gradnigo's injuries, or any aggravation of her pre-existing degenerative spinal changes caused by the accident, were resolved by February 2006. Moreover, they argue that any injuries suffered after the accident were not severe enough to alter her lifestyle.

Her credibility was placed at issue, they argue, when she was confronted during the trial about multiple conflicting statements she made to her various medical providers regarding her levels of pain and mobility throughout her treatment. Defendants also assert that it was established through the testimony of co-workers at

LGMC who worked with Gradnigo during the two years following the accident that she did not exhibit any physical limitations at work during that time. Her employment file showed that she was given excellent performance ratings and received regular merit pay increases as a result. Finally, Gradnigo missed minimal days of work, barely more than two weeks during the two years following the accident. She also took multiple vacations with her spouse during this time.

Considering the facts presented, we cannot find that the award of $30,000.00 for past and future pain and suffering is abusively low.

*Loss of Enjoyment of Life*

"[L]oss of enjoyment of life is a compensable component of general damages" that also involves the inherently speculative valuation of a person's quality of life, which cannot be definitively measured. *McGee v. A C & S, Inc.*, 05-1036, p. 4 (La. 7/10/06), 933 So.2d 770, 774. These damages serve to compensate for the "detrimental alterations of a person's life or lifestyles or a person's inability to participate in the activities or pleasures of life that were formerly enjoyed." *Id*. at 773.

Gradnigo argues that the jury's failure to award damages for her loss of enjoyment of life after the accident was an abuse of discretion because she presented testimony at trial of how her back pain has restricted her from sitting, standing, or walking for any extended period of time. This, she asserts, had caused limitations in her ability to do housework, perform gardening and other yard work, play with her children, attend church, visit with family and friends, attend social functions, and go on vacation.

Only the testimony of Gradnigo and her husband was offered in support of this claim. The defendants argue that this claim was, nevertheless, called into

12

question because of the credibility issues caused by Gradnigo's inconsistencies in reporting her conditions to her healthcare providers, as referred to earlier in this opinion. In addition, they argue that her ability to continue working as an LPN after the accident and to cease treatment for more than a year, two years after the accident, is proof of the minimal impact the accident likely had on her lifestyle. Gradnigo's husband's testimony about her suffering a diminished lifestyle after the accident was likely not given great weight either, they contend, because he was shown to have offered untrue testimony that conflicted with testimony his wife had given. Specifically, he testified that he and his wife had only taken one local vacation since the accident's occurrence, while she testified that they had taken several vacations since the accident.

In summary, although evidence was presented at trial that Gradnigo received treatment for injuries either caused by or aggravated by the accident, there was also contrasting evidence presented of inconsistencies and perhaps, untruthfulness, regarding the severity and longevity of any such conditions. The question is whether the award for the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. *Youn*, 623 So.2d at 1260. In other words, is this lack of an award beyond that which a reasonable trier of fact could assess for the effects of the particular injury to this plaintiff under these facts? We think the discretion has been abused and, as such, raise the award to the lowest reasonable award of $10,000.00.

*Loss of Consortium*

"The compensable elements of damage in a claim for loss of consortium include loss of society, sex, service, and support." *LeBlanc v. Acadian Ambulance Serv., Inc.*, 99-271, p. 33 (La.App. 3 Cir. 10/13/99), 746 So.2d 665, 684 (quoting

*Mathews v. Dousay*, 96-858, p. 18 (La.App. 3 Cir. 1/15/97), 689 So.2d 503, 515). A cause of action for this claim arises when the injured party's condition so deteriorates, the spouse is actually deprived of consortium and society. *Delphen v. DOTD*, 94-1261 (La.App. 4 Cir. 5/24/95), 657 So.2d 328, *writs denied*, 95-2116, 95-2124 (La. 11/17/95), 663 So.2d 717. It is asserted that the jury's award to Gerald, Gradnigo's spouse, of $0 for his loss of consortium, was abusively low and should be increased to $20,000.00 for his loss of his wife's ability to perform household duties, and the diminishing of their sex and social life.

Gerald claims entitlement to this award because his wife could no longer perform certain household duties after the accident. Consequently, he and his sons had to perform those tasks or assist her. He also stated that the couple's sex life had diminished, his wife was not the same after the accident, and they "basically stayed home all the time."

Defendants argue that the jury's findings and determinations in this regard were reasonable based on the fact that Gerald's testimony regarding one aspect of the couple's social life was contradicted; he was shown as being untruthful about the extent of the couple's vacation travels after the accident. Also, they assert that it is not unreasonable for the jury to have concluded that Gradnigo's physical capabilities and emotional state did not significantly change at home or in relation to her spouse after the accident. This is based on the fact that Gradnigo's ability to continue nursing at such a high performance level after the accident continued. Moreover, no other persons with personal knowledge of Gradnigo pre- or post-accident were presented to offer testimony at trial regarding these assertions of a negative change in her physical, emotional, or social state during this time.

14

We agree with the court in *Finley v. Bass*, 478 So.2d 608, 614 (La.App. 2 Cir. 1985), that while "every personal injury tends to decrease the parties' overall happiness," it is the plaintiff who carries the burden of proving a definite loss on each element of damages. The plaintiff was not successful in showing such losses here. We cannot say that the jury was clearly wrong in failing to find a loss of consortium.

### *Special Damages*

### *Past and Future Medical Expenses*

In this case, Gradnigo sought $14,526.55 in medical expenses; however, the jury awarded only $10,000.00 medical expenses. Gradnigo contends that this award is abusively low and seeks the full amount of her past medical expenses and also seeks future medical expenses in excess of $100,000.00. The jury awarded $15,000.00 for future medical expenses. The defendants speculate that this amount is reasonable because it is consistent with the cost of future spinal injections from pain management specialist, Dr. Staires. Dr. Staires' injections were successful in providing almost complete relief to Gradnigo during her treatment with him, according to her testimony.

In *Simon v. Lacoste*, 05-550, p. 3 (La.App. 3 Cir. 12/30/05), 918 So.2d 1102, 1104-05, this court recognized the following regarding awards of medical expenses:

> [W]hen a plaintiff alleges that medical expenses were incurred "and that allegation is supported by a bill, unless there is sufficient contradictory evidence or reasonable suspicion that the bill is unrelated to the accident, it is sufficient to support the inclusion of that item in the judgment." [Esté v. State Farm Ins. Co., 96-99, p. 10 (La.App. 3 Cir. 7/10/96), 676 So.2d 850, 857.] A fact finder errs if it fails to award the full amount of medical expenses incurred as a result of the accident and proven by a preponderance of the evidence. *Revel v. Snow*, 95-462

15

(La.App. 3 Cir. 11/2/95), 664 So.2d 655, *writ denied*, 95-2820 (La. 2/2/96), 666 So.2d 1084.

Gradnigo introduced evidence of past medical expenses totaling the amount requested that were incurred during her periods of treatment for alleged accident-related injuries. No evidence was offered to contradict these bills or to provide reasonable suspicion that they were incurred for an unrelated accident or occurrence. Rather, the treatments, services, and prescriptions were corroborated and causally connected to the accident at issue by the testimony offered by Dr. Cobb and Dr. LeBean. Therefore, based on the uncontroverted medical evidence in the record, we award Gradnigo her accident-related and incurred medical expenses of $14,526.55.

This court, in *Veazey v. State Farm Mutual Auto Insurance*, 587 So.2d 5, 8 (La.App. 3 Cir. 1991) (citations omitted), discussed future medical expenses:

> Future medical expenses, like any other damages, must be established with some degree of certainty. The plaintiff must show that, more probably than not, these expenses will be incurred. Awards will not be made in the absence of medical testimony that they are indicated and setting out their probable cost. An award for future medical expenses cannot be based on mere speculation of the jury. Much stronger proof, such as medical testimony of the specific expenses to arise, should be required for such an award.

It is when the record establishes that future medical expenses "will be necessary and inevitable," that such should not be rejected. *See Stiles v. K Mart Corp.*, 597 So.2d 1012, 1013 (La.1992). Future medical expenses are reviewed by an appeals court pursuant to the manifest error standard of review. *See Armentor v. Safeway Ins. Co.*, 07-805 (La.App. 3 Cir. 12/19/07), 972 So.2d 444.

Dr. Cobb testified that surgical intervention via laminectomy, discectomy, and fusion was a possibility for this patient, as a last resort only, and

would be dependent upon her subjective complaints of pain. Dr. Cobb testified that this was because his neurological examinations of her, which were subjective, all produced normal findings during his course of treating and observing her. Dr. Cobb provided an estimate of the cost of such a procedure in the amount of $107,596.82, and discussed post-operative treatments and equipment that would be a part of the recovery period for which he did not provide a cost estimate.

Based on these facts, we cannot say the jury manifestly erred or was clearly wrong in denying the requested future medical expenses. It was not established with certainty that such surgery would more probable than not be inevitable and necessary for this plaintiff.

*Lost Wages and Loss of Future Earning Capacity*

To recover for actual wages lost, the plaintiff must be able to positively prove that he or she would have been earning wages but for the accident at issue. *Boyette v. United Servs. Auto. Ass'n,* 00-1918 (La. 4/3/01), 783 So.2d 1276. "In other words, it is the plaintiff's burden to prove past lost earnings and the length of time missed from work due to the accident." *Id*. at 1279 (citing *ANMAC Found., Inc. v. St. Patrick Hosp. of Lake Charles*, 594 So.2d 951 (La.App. 3 Cir. 1992)).

Gradnigo alleges that she missed sixteen days of work due to illness associated with this accident. Seven days were missed at a rate of pay of $19.80 per hour ($1,108.80) while working for LGMC. In 2006 after leaving LGMC, she claims to have missed nine days of work at a rate of pay of $20.38 per hour ($1,467.36), for a total wage loss of $2,576.16. Gradnigo asserts on appeal that she was entitled to the $2,576.16 in lost wages and an additional $21,247.00 in lost wages incurred. The $21,247.00 is the calculation of the difference between her rate of pay as an LPN at LGMC and her lower rate of pay at her subsequent employment, which she claims she

was ultimately forced to take because of the light-duty work restrictions imposed by her physicians.

The jury awarded only $1,200.00 in lost wages, clearly rejecting the plaintiffs' request for all asserted lost wages incurred after voluntarily terminating her employment at LGMC in 2006. We cannot say that the jury was manifestly erroneous in rendering this award when it was shown at trial that Gradnigo ceased all medical treatment for the alleged injuries in 2006, for a period lasting approximately eighteen months. Moreover, although Gradnigo changed employment in 2006, she offered no proof that she was required to leave LGMC for less physically demanding employment as a result of her alleged accident-related injuries. The record reflects that she was never placed on a work restriction by any of her physicians after the accident, and she was able to perform her job at LGMC after the accident at her pre-accident work level, without accommodation.

The jury also rejected Gradnigo's claim for loss of earning capacity. We find the jury acted within its discretion in doing so. The law on loss of earning capacity was stated in *Folse v. Fakouri*, 371 So.2d 1120, 1123-24 (La.1979) as follows:

> What plaintiff earned before and after the injury does not constitute the measure. Even if he had been unemployed at the time of the injury he is entitled to an award for impairment or diminution of earning power. And while his earning capacity at the time of the injury is relevant, it is not necessarily determinative of his future ability to earn. *Coco v. Winston Industries, Inc.*, 341 So.2d 332 (La.1976). Damages should be estimated on the injured person's ability to earn money, rather than what he actually earned before the injury.
>
> . . . .
>
> Earning capacity in itself is not necessarily determined by actual loss; damages may be assessed for the deprivation of what the injured plaintiff could have earned

18

despite the fact that he may never have seen fit to take advantage of that capacity. The theory is that the injury done him has deprived him of a capacity he would have been entitled to enjoy even though he never profited from it monetarily.

The record reflects that the jury was reasonable in concluding that Gradnigo failed to establish any deprivation or diminution of her earning power as a result of the accident. We find no manifest error in the jury's decision to not award damages for loss of earning capacity.

### *Defendants' Assignment of Error*

*Taxing of Expert Witness Fees*

Pursuant to the Louisiana Code of Civil Procedure, the allocation of court costs is within the discretion of the court:

**Art. 1920. Costs; parties liable; procedure for taxing**

Unless the judgment provides otherwise, costs shall be paid by the party cast, and may be taxed by a rule to show cause.

Except as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable.

Witnesses called to testify as expert witnesses are to be compensated for their services, with the amount to be determined by the court and taxed as costs to be paid by the party cast in judgment. La.R.S. 13:3666. We cannot say that the trial court abused its discretion in allocating costs in the manner chosen. This assertion is without merit.

19

IV.

**CONCLUSION**

The jury's award of $10,000.00 in past medical expenses is amended, and plaintiff-appellant, Adele Gradnigo, is awarded $14,526.55 for past medical expenses incurred, in accordance with the evidence established at trial. Further, we amend the jury's award of $0 to Adele Gradnigo for past and future loss of enjoyment of life and raise the award to $10,000.00. All other aspects of the jury's damage awards are affirmed.

We affirm the trial court's assessment to the defendants of the expert witness costs for orthopedic surgeon, Dr. John Cobb, vocational rehabilitation counselor, Scott Smith, and economist, Dr. Douglas Womack.

Costs of this appeal are to be borne equally by all parties to this appeal.

**AFFIRMED AS AMENDED**.